IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  06-cv-00324-WDM-KLM

PRINCE LIONHEART, INC.,

      Plaintiff(s),

v.

HALO INNOVATIONS, INC.,

      Defendant(s).

_____

**MINUTE ORDER**
_____

**ORDER ENTERED BY MAGISTRATE JUDGE KRISTEN  L. MIX**

This matter comes before the Court on the **Defendant's Motion to Compel Production of Documents Pursuant to Fed.R.Civ.P. 37(a)(2)(B) and D.C.Colo.L.R. 7.1A Certificate of Compliance** (Docket No. 51, filed July 9, 2007) (the "motion"). Pursuant to the Order of Reference dated August 3, 2007 and the memorandum dated July 7, 2007, the motion was referred to the Magistrate Judge.  The Court has reviewed the motion, Plaintiff's Opposition (Docket No. 60, filed July 30, 2007), Defendant's Reply (Docket No. 62, filed July 31, 2007), the arguments of counsel presented at the hearing held on August 31, 2007, the case file, the exhibits, and the applicable law and is sufficiently advised in the premises.  The Motion is **GRANTED** as specified below.

I.  Jurisdiction

Jurisdiction in this action is based on federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a).  Complaint, p. 3 (Docket No. 1, filed February 24, 2006).  In its Response, Plaintiff states that "Rule 501 of the Federal Rules of Evidence provides that state law supplies the rule of decision on privilege in diversity cases." Response in Opposition to Defendant's Motion to Compel Production of Documents Pursuant to Fed.R.Civ.P. 37(a)(2)(B), p. 4 (Docket No. 60, filed July 30, 2007).  While this is true, according to the allegations of the Complaint, jurisdiction in the case is based on the existence of a federal question, not diversity of citizenship between the parties. Consequently, pursuant to Federal Rule of Evidence 501,  the federal common law of privilege applies, and not Colorado state law, as the Plaintiff has implied.  *See, e.g.*, *In re Qwest Communications Intern., Inc.*, 450 F.3d 1179, 1184 (10th Cir. 2006).

## II.  Statement of the Case

This action was brought by Plaintiff ("Plaintiff" or  "Prince Lionheart"), a manufacturer of infant care products, against Halo Innovations ("Halo"), another manufacturer of infant care products.  Plaintiff has alleged that Defendant developed a line of infant sleep products which directly competes with a line of products, called "Back to Sleep," developed by Plaintiff.  The Complaint (Doc. No. 1, filed February 24, 2006) asserts claims for trademark violations under sections 32 and 43 of the Lanham Act, 15 U.S.C. § 1114 and § 1125(c), as well as deceptive trade practices in violation of the Colorado Consumer Protection Act, C.R.S. § § 6-1-101, *et seq.*  For its part, Defendant admits that it uses the phrase "Back to Sleep" in connection with its products, but alleges

that the phrase has been in the public domain since at least 1994. *See* Defendant's Answer and Counterclaims, p. 1-2. (Doc. No. 4, filed May 1, 2006). Further, in Defendant's Second Motion to Amend its Answer and Counterclaims Pursuant to Fed. R. Civ. P. 15(a), p. 6 (Docket No. 28, filed January 5, 2007), Defendant alleges that Plaintiff committed fraud by manufacturing false sales of its product in order to deceive the Trademark Office and avoid cancellation of its mark.

Defendant has moved to compel production of documentary communications between Prince Lionheart and its trademark attorney, Ken Hovet, relating to certain declarations filed with the U.S. Patent & Trademark Office ("PTO") in connection with Plaintiff's U.S. Trademark Registration No. 2,139,780 ("'780 Registration"). Defendant avers that it is specifically interested in discovering any "reminder letters" that Mr. Hovet sent to the Plaintiff advising of the need to make sales of the product before the declarations were filed. It does not appear to be disputed that ordinarily these documents would not be discoverable based on the attorney-client privilege. The heart of the dispute is whether the privilege was waived as a result of questions asked and answered during the deposition of Thomas McConnell, President of Prince Lionheart. Defendant argues that Plaintiff waived its attorney-client privilege with respect to certain communications by failing to timely object to deposition questions seeking information about the legal advice Plaintiff received from Mr. Hovet, and by answering those questions and disclosing actual details of the legal advice that Mr. Hovet provided.

### III. Standard of Review

3

Fed. R. Civ. P. 26(b) permits discovery "regarding any matter, *not privileged*, that is relevant to the claim or defense of any party" and discovery of any information that "appears reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1) (emphasis added).  *See also Williams v. Board of County Commissioners*, 192 F.R.D. 698, 702 (D. Kan. 2000) (request for discovery should be considered relevant if there is any possibility the information sought may be relevant to a claim or defense). By excluding "privileged" information from the broad parameters of pre-trial discovery, Rule 26 attempts to strike a balance between conflicting interests.  Privileges further the administration of justice and "should not be set aside lightly."  *Horton v. United States*, 204 F.R.D. 670, 672 (D. Colo. 2002).  *See also McNeil-PPC, Inc. v. Procter & Gamble Co.*, 138 F.R.D. 136, 138 (D. Colo. 1991) ("protections of the work-product privilege are important and should not be set aside lightly").   However, privileges also have the effect of withholding relevant information from the finder of fact, and for that reason should be narrowly construed.  *Montgomery v. Leftwich, Moore & Douglas*, 161 F.R.D. 224, 225 (D.D.C. 1995).  The Supreme Court has "warned that testimonial privileges 'are not lightly created nor expansively construed, for they are in derogation of the search for truth.' " *In re Grand Jury Subpoena*, 397 F.3d 964, 984 (D.C. Cir. 2005) (Henderson, J., concurring) (quoting *United States v. Nixon*, 418 U.S. 683, 710 (1974).

The party resisting discovery on grounds of privilege bears the burden of coming forward with facts that would sustain the claimed privilege.  *See Resolution Trust Corp. v. Heiserman*, 151 F.R.D. 367, 373 (D. Colo. 1993) ("[t]he burden of proving the attorney-

client privilege rests on the party raising that privilege").  The party withholding information on the basis of privilege must make a clear showing that the asserted privilege applies and must establish all elements of the privilege.  *National Union Fire Ins. Co. of Pittsburgh v. Midland Bancor, Inc.*, 159 F.R.D. 562, 567 (D. Kan. 1994).  *See also* Fed. R. Civ. P. 26(b)(5) (the party claiming privilege must present sufficient information to permit the opposing party to assess the applicability of the privilege).

The parameters of the attorney-client privilege are well-established.  *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (noting that the attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law").  The attorney-client privilege protects communications between a client and an attorney, made in order to obtain or deliver legal assistance, that were intended by the participants to be confidential.  *Aull v. Cavalcade Pension Plan*, 185 F.R.D. 618, 624 (D. Colo. 1998).  *See also Cavallaro v. United States,* 284 F.3d 236, 245 (1st Cir. 2002) (identifying the essential elements of the attorney-client privilege).

For purpose of the motion before the Court, neither party appears to argue that the documents sought are not protected by the attorney-client privilege.  The Defendant correctly notes that generally, disclosing attorney-client communications to a third party results in a waiver of the attorney-client privilege.  *See In re: M & L Business Machine Co., Inc.*, 161 B.R. 689, 693 (D. Colo. 1993) ("Generally, the attorney-client privilege is lost if the substance of the confidential communication is disclosed to a third party, even inadvertently");  *Sedillos v. Board of Education of School Dist. No. 1*, 313 F. Supp. 2d

1091, 1093 (D. Colo. 2004) ("the attorney-client privilege can be waived by '[a]ny voluntary disclosure by the client' of an otherwise privileged confidential communication") (citations omitted).

IV.Analysis

A.     Statements made by Plaintiff, Thomas McConnell, During Deposition on March 6, 2007

During the deposition of Thomas McConnell, President of Prince Lionheart, taken on March 6, 2007, the Plaintiff answered questions regarding communications he had with his attorney, Ken Hovet.

Q:     How do you know that you had a requirement to show use in interstate commerce?
A:     I believe our lawyer told me.
Q:     Which lawyer?
A:     Ken Hovet.

Deposition of Thomas McConnell, Exhibit A to Defendant's Motion to Compel Production of Documents Pursuant to Fed.R.Civ.P.37(a)(2)(B) and D.C.Colo.L.R. 7.1A Certificate of Compliance, at 23:21-25 (Docket No. 51-2, filed July 9, 2007).

Q:     Do you remember what he said?
A:     Well, I think he gave me a – a date that we had to, you know, it would be smart if we showed some, you know, sales of our product recently, so we did.
Q:     Did he ask you if you had sold your product recently?
A:     Well, yeah, he knows that it is on our web site and all that – as a matter of fact, I think we had some of our sleep sacks on our web site at the time, too. It has continuously been on our web site, but as I said, we weren't pushing it so we had to, you know, I think, be a little bit more forthright in suggesting that people sell.

*Id.* at 24:23-25:11.

Q:     After you met with Kahala Kids and – and they bought the sleep positioners

6

shown in Exhibit 2, did you then inform Mr. – your attorney, how do you say his name?

A:    Hovet.

Q:    Did you tell him that Kahala Kids had purchased infant positioners from you?

A:    I think what we did is we sent him a copy of the invoice.

*Id.* at 26:25-27:8.

Q:    Why do you think that's probably what happened?

A:    Well, I think that that's what he asked, I think, is just proof of sale in interstate commerce, and I believe that's what we did.

*Id.* at 27:11-15.

Q:    So I think you said that the only time you ever asked someone – any of your customers or anyone if they wanted to buy an infant positioner was Kahala Kids, and that sale was reflected in this invoice, which is Exhibit 2; is that right?

A:    Right.

Q:    Why – why did you ask Kahala Kids?

A:    Because I was there in Hawaii.

Q:    And why did you ask them when you did?

A:    Well, because as I believe I have said, Ken Hovet apprised me that it would be good to have some sales in interstate commerce before some date, and I don't even know what the date was.

Q:    Was it around the time of this invoice, though?

A:    He got it around that time, yeah.

*Id.* at 30:20-31:11.

Q:    Why did the sales rep sell this infant positioner to Merry Go Round?

A:    Well, I think that, you know, I was aware that Ken Hovet suggested we sell some of these. I spoke with our vice president about it, and she probably somehow disseminated the word to at least one of our sales reps. We wanted to sell some of these things, and a sale occurred.

*Id.* at 34:7-14.

Q:    And so you had a discussion with her about what Mr. Hovet told you about–

A:    I might have, I might have, but I didn't make this sale, but one of our sales reps did, and I – my likely thought is the information that we wanted to get

a little activity out of some of our dormant sales reps on selling some product filtered down because I believe this, you know, this is a very poor copy, I must say.  It says – ....

*Id.* at 35:3-8.

Q:     Did Mr. Hovet tell you that you need to periodically file a statement with the trademark office swearing that the mark is still in use to keep your Federal trademark registration?
A:     Are you referring to this?
Q:     I am not –
A:     I mean this is the only one that I have seen. I did get a letter from him saying that we have until February 28th, 2008 or something – 2008 to file something.
Q:     My question was directed generally to this idea. Did Mr. Hovet ever tell you that you need to periodically file statements with the trademark office swearing that your mark is still in use to keep your trademark registration?
A:     Probably because I think it was Mr. Hovet that said that, but we do that with several of our other products that have trademarks on that.

*Id.* at 163:11-164:3.

Q:     I am not. I am just trying to get your understanding of what you have to do to keep your Federal registration, for one thing, and also why this paper was filed.
A:     Well, it was filed because we from day one had an intention to flesh out the Back to Sleep line. As a matter of fact, in November of 2003, we filed for a – a patent, a U.S. patent on a temperature-sensing device which was specifically for a sleep sack. Again, I told you that we try to improve on products. The Therma-flow vent down in the bottom, we filed for a patent on that one as well, as well as a trademark. We were working on all this. We knew we were going to continue with this Back to Sleep mark. It was very important to us, from day one, everybody in my office can tell you that, because they were all aware of that, and if there was a date in which we should file – and I think that probably that, just showing that we were – I mean the little bears that you took, I mean we have done a lot of things that have Back to Sleep noted on them, and it's always been our intention to keep this line going, and if Mr. Hovet said that, you know, I think it would be a good idea to show some sales of this thing, okay, I am a relatively good salesman, I go out to an account, three minutes I sell a product which some of my salespeople should have been selling years ago, but you know, we sell it, we keep the – the – the trademark active. But I think that the fact that

we are filing patents, all that stuff, that shows our intention was always to keep this trademark active.

*Id.* at 164:23-166:5.

Q:      Okay, just sort of to close this up, have you told me everything you can remember about discussions you had with Mr. Hovet regarding this affidavit that was filed for your Back to Sleep mark in 2004?

A:      Have I discussed everything with you?

Q:      Have you – yeah, have you told me everything you can remember that was discussed with Mr. Hovet about that document and about sales of Back to Sleep?

A:      Well, he was aware of the fact that we wanted to – that we were planning to bring out more items in our Back to Sleep line, he knew that the trademark was very valuable to us, and he knew that these things were going to be coming to market relatively soon, but he wanted us to make some sales right then just to show evidence of – of actual sales of the product despite its being on the web site.

You see, even in this letter, this Basic Comfort letter of 2002, it says – the guy says: Prince Lionheart have intended to use the mark on some additional or different products. Even this guy was aware of that from talking with Ken Hovet, except we are a little bit slowed down with some of the, you know, Halo activity, to be honest with you, with the sleep sack.

Q:      Okay. We will talk about that in a minute. At the time that this document was filed, did Mr. Hovet know that you had not sold any Back to Sleep infant positioners from 1999 to until January of 2004?

A:      I don't think he knew about – about that, no.

Q:      You didn't tell him?

A:      I didn't. I don't think he knew. I don't know if he asked anybody else. I didn't talk to him about it.

Q:      Did he ask you if the mark had been in continuous use for five years?

A:      Well, it's always been in use. We have the product – it's there, it's for sale, it's in our, you know, showroom essentially. If people want it, they can buy it. If it's on the web site, they want it, they can buy it.

Q:      And do you understand that continuous use as used in this document means trademark use?

A:      Right, on the product.

Q:      And that's what to you means –

A:      Well, we were using, as I said before many times, the Back to Sleep is internal identification of the products that we were making.

9

*Id.* at 176:15-178:16.

Q:     So one thing I guess I still – I don't quite understand is if – if using – having the product on your web site was – and your intentions for your Back to Sleep line as you have told me about today, if that was good enough to maintain your trademark rights in your Back to Sleep registration, why did you have to have actual sales in January of 2004?

[Plaintiff's Counsel]: Object to foundation.

A:     I would just say that was the belts and suspenders thing, that is, you know, something that Ken Hovet suggested, so we did it. We usually follow the advice of our attorneys.

*Id.* at 180:1-13.

## B.  Legal Analysis

Defendant argues that the communications between the Plaintiff and his attorney, Mr. Hovet, are relevant to the claims and defenses at issue in the lawsuit, particularly the fraud defense asserted by Defendant.  Defendant asserts that "evidence of what Mr. Hovet said in his reminder letters is relevant to the issue of what Prince Lionheart and Mr. Hovet understood the requirement of sales to be, which is very relevant to the intent element of Halo's fraud defense." Defendant's Motion to Compel Production of Documents Pursuant to Fed.R.Civ.P.37(a)(2)(B) and D.C.Colo.L.R. 7.1A Certificate of Compliance, at p. 4 (Docket No. 51, Filed July 9, 2007).  Defendant argues that not only are these documents discoverable due to their relevance, but any potential protection of attorney-client privilege was voluntarily waived when Mr. McConnell disclosed the substance of communications with his lawyer during his deposition.  Defendant relies on *In re Qwest Communications Intern. Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006) in arguing that, "any voluntary disclosure

10

by the client is inconsistent with the attorney-client relationship and waives the privilege."
Defendant's Motion at p. 5.    Further, Defendant points out that failure of the client to
assert the privilege or timely object to requests for disclosure on the basis of privilege will
result in waiver of the privilege.  *Tsai-Son Nguyen v. Excel Corp.*, 197 F.3d 200, 207 (5th
Cir. 1999).  It is beyond dispute that, in the context of a deposition, an objection asserting
attorney-client privilege must ordinarily be raised when the question seeking privileged
material is asked.  *See* 8 Fed. Prac. and Pro. Civ.2d § 2016.1, at 228-29 (1994).

   For its part, Plaintiff does not appear to dispute that a waiver of the attorney-client
privilege may have occurred.  Instead, Plaintiff argues that "the documents requested by
the Defendant do not contain a simple discussion of the § § 8 and 15 filings. Rather,
several of the documents include the issue as part of a broader conversation of issues
about which Mr. McConnell was not asked, and about which he did not testify."  Plaintiff
Prince Lionheart, Inc.'s Response in Opposition to Defendant's Motion to Compel
Production of Documents Pursuant to Fed. R. Civ. P. 37(a)(2)(B), p. 5 (Docket No. 60, filed
July 30, 2007).  For that reason, Plaintiff argues that "a limited waiver of privilege cannot
be construed as the granting of permission to discover all attorney-client communications."
*Id.*  However, it does not appear that Defendant is attempting to discover all attorney-client
communications.  Instead, Defendant has asked for specific documentary communications
between Plaintiff and Mr. Hovet that relate to the § § 8 and 15 declarations filed with the
PTO in connection with the Plaintiff's '780 registration.  Indeed, "the scope of the waiver
turns on the scope of the client's disclosure . . . ."  *United States v. Collie*, 128 F.3d 313,

11

320 (6th Cir. 1997).

The Court has reviewed, *in camera*, the documents that the Defendant is attempting to discover.  The Court finds that sections of these documents are relevant to the fraud defense that the Defendant is asserting against the Plaintiff.  Further, the Court finds that considering the statements made during Plaintiff's President's deposition and the lack of any objection based on attorney-client privilege, Plaintiff has waived the attorney-client privilege regarding communications between Prince Lionheart and Mr. Hovet that specifically relate to the § § 8 and 15 declarations filed with the PTO in connection with the Plaintiff's '780 registration.  However, any communications between Mr. Hovet and the Plaintiff which do not relate to the § § 8 and 15 declarations filed with the PTO remain privileged and shall be protected by the Court, as they are not within the scope of the waiver of attorney-client privilege.

**IT IS ORDERED** that the Motion is **GRANTED**.  The Plaintiff shall produce for inspection and copying, on or before September 24, 2007, the following documents, which are to be redacted and/or disclosed in the following manner:

1. Email from Tom McConnell to Kenneth J. Hovet, dated November 21, 2003, Subject: RE: Halo - Back to Sleep, 2 pages: The sentence beginning "Dear Ken" and ending with "mid-2004. Tom" is to be disclosed.  The sentence beginning "Tom, please take care" and ending "in the lawsuit. Ken" is to be disclosed.  The remainder of the email is to be redacted, as it is not relevant to the § § 8 and 15 declarations.

2. Fax from Kenneth J. Hovet to Suzanne Allen de Sanchez - Prince Lionheart,

12

dated October 22, 2004, 5 pages:  The first page is not directly relevant and is to be redacted.  The second through fifth pages are to be disclosed in whole.

3. Letter from Kenneth J. Hovet to Tom McConnell, dated February 24, 2004, Re: U.S. Trademark Registration No. 2,139,780 on BACK TO SLEEP; Our Ref. 1096.874 (14372.002), 2 pages:  The first three paragraphs of the letter are to be disclosed.  The remainder of the letter is to be redacted.

4. Email from Kenneth J. Hovet to Tom McConnell; Kenneth J. Hovet, dated December 10, 2003, RE: Back to Sleep trademark, 1 page:  The paragraph beginning "In view of the above" and ending "action against Halo" is to be disclosed.  The paragraph beginning "Debbie tells me" and ending "will sue them" is to be disclosed.  The remainder of the email is to be redacted.

BY THE COURT:

/s/ Kristen L. Mix

United States Magistrate Judge

Dated:  September 17, 2007